UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESEE
AT KNOXVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 3:08-CR-69 |
| | ) | VARLAN/GUYTON |
| JOHN REECE ROTH | ) | |

### DEFENDANT ROTH'S MEMORANDUM OF LAW IN
### SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Roth has filed a motion for a judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29(c) based on the following grounds. First, neither the Force Stand nor the data generated from contract no. FA 8651-05-C-0116, "Augmented UAV Flight Performance Using Nonthermal Plasma Actuators" (the "Phase II Contract"), was a "defense article" or "technical data" relating to a "defense article" as those terms are defined in Category VIII of the United States Munitions List ("USML").[1] Second, the evidence is insufficient to sustain a conviction, that is, to establish that defendant willfully violated the Arms Export Control Act ("AECA").

### Standard For Review

In a motion for judgment of acquittal, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

---

[1] This argument does not apply to Defendant's conviction on Count 11 (relating to the DARPA proposal). That count is addressed below at pp. 9-10.

## The Relevant Evidence

The government relied on certifications from the Department of State, Directorate of Defense Controls (G.E. 46A), and the testimony of Jesse Crump, the Department of Defense employee who recommended that the State Department conclude that the data and other items (including the DARPA proposal and the Force Stand) were defense articles.[2] Mr. Crump also offered the opinion that the data provided to Xin Dai, contained in the draft 2007 AIAA paper (sent to Dr. Roth by email and later provided to Mr. Nourgostar) and the Force Stand itself, were not in the public domain and did not constitute fundamental research. He premised this latter opinion on the absence of an "authorized release" of data relating to those items. There was no evidence submitted to the jury regarding the nature of any restriction on the release of the data or its dissemination that was the apparent basis of Mr. Crump's conclusion that the research performed in the Phase II project was not fundamental research. Nor was there any testimony by Mr. Crump or any other witness that rebutted the assertions by Mr. Sherman that the design of the AGT actuators and Force Stand were already in the public domain, as evidenced by the published articles and textbooks identified in D.E. 421 (Sherman 11/7/2007 email to Bonds).

On cross-examination, Mr. Crump acknowledged that his initial finding, rendered in September, 2006, approximately four months after the commencement of the government's investigation, was that *none* of the items which were the subject of the Indictment were included on the USML and thus were not defense articles or technical data relating thereto. Mr. Crump also acknowledged that it was his current opinion that none of the items addressed in the

---

[2] Both the certifications and Mr. Crump's testimony identified the Force Stand as a "defense article" pursuant to subpart (h) of Category VIII, and the remaining items (including the DARPA proposal) as "technical data" pursuant to subpart (i) of Category VIII. Mr. Crump also offered his opinion that all of these items fell within Category IV(b) of the USML, an issue which was not submitted to the jury.

Indictment posed any risk to national security or critical Department of Defense programs and that he would have recommended all of the items for public release had a request been made.

As did other government witnesses with claimed export control expertise, Mr. Crump acknowledged that the scope of the Phase II project was limited to applying the research results to a civilian, off-the-shelf, commercially available aircraft (the Osprey), and did not include any application or testing on a military aircraft. *See* G.E. 5 at pp. 26, 40-44 (AGT proposal). Such an ultimate application, however, was the eventual goal of the Air Force, albeit one not within the scope of the contract. Mr. Crump contended that the intended eventual application of the actuators to the Osprey rendered it a military aircraft within the meaning of Category VIII(a) of the USML.

Mr. Crump also acknowledged that the DARPA proposal was comprised almost entirely of information available in the public domain. Mr. Sherman identified most of the data as being from his Master's Thesis and available on a public website, with the exception of certain information that apparently concerned a Boeing aircraft. There was no evidence, however, that the portion of the DARPA proposal regarding the Boeing aircraft was "technical data directly relating to a defense article on the USML."

Finally, and on a separate issue, Mr. Crump was uncertain that the mere carrying of an export-controlled item to a foreign country, with nothing more, would amount to an "export" within the meaning of the AECA.

It is fair to say there was less than unanimity in the proof regarding the particular defense article that the data and Force Stand fell within, although the jury was charged and returned a verdict premised solely on Category VIII. Other government witnesses with avowed expertise in the applicable regulations disagreed at least in part with Mr. Crump regarding the particular

defense article to which the technical data related. Captain Grigsby testified that the data generated by the project related to the defense article described in Item 1, Category 1 of the USML. Frederick Davis identified Categories II and IV as the most likely candidates, allowing on re-direct that Category VIII could apply but for the civilian character of the aircraft. This lack of unanimity regarding the status of the research data was further evidenced in a series of emails initiated by Mr. Sherman in the fall of 2006, during which an Air Force representative opined that "the basic research is not the problem" in response to Mr. Sherman's requests for identification of what was and what was not technical data subject to export control limitations. *See* D.E. 387; *see also* D.E. 397; D.E. 401 (Sherman email exchanges with Air Force representatives).

In contrast to the government witnesses, Dr. Roth had no prior exposure to projects subject to export control restrictions and no training regarding those restrictions. When interviewed by the government, in his discussions with University of Tennessee employees, and in his testimony at trial, he consistently expressed the same understanding of the nature of those restrictions: they did not apply to the basic, fundamental research being conducted in the University of Tennessee Plasma Lab and at AGT; and export control restrictions only applied once the Air Force made a determination that the research was successful and could be applied to some military article. The University of Tennessee employees who delivered the news to Dr. Roth in May 2006 that the subcontract prohibited employment of foreign nationals in the project each testified that Dr. Roth reacted with surprise and contested their conclusion based on his professed understanding that the restrictions did not apply to the type of research being performed during the project. Agent Gounaud's testimony was to the same effect.

4

With respect to the DARPA proposal, there was no evidence that Dr. Roth ever opened or reviewed that document at any time, or that he was otherwise aware that the Boeing information was included in that proposal. He received that document as an attachment to an email and testified that he had no recollection of ever opening the attachment. *See* G.E. 30 B. Nor was there any testimony that any of the data in the DARPA proposal either was or was not "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of" a defense article, *see* 22 C.F.R. §120.10 (a)(1), or that it was or was not "information concerning general scientific . . . principles commonly taught in . . . universities . . . or information in the public domain," *see* 22 C.F.R. §120.10(a)(5), or that any restriction on publication or other "specific access and dissemination controls protecting information resulting from the research are applicable." *See* 22 C.F.R. §120.11(8).

## Argument

1. **None of the Phase II items subject to the substantive AECA counts were technical data directly relating to an aircraft specifically designed, modified, or equipped for military purposes.**

    a. **Neither the Phase II data nor the Force Stand was directly related to an aircraft specifically designed, modified, or equipped for military purposes.**

This Court instructed the jury that in order to find the Defendant guilty of violating the Arms Export Control Act, the government must prove beyond a reasonable doubt that Defendant exported a defense article, or technical data directly relating to such an item, that is listed on the United States Munitions List ("USML"). *See* Charge to the Jury, at 33. The instructions defined defense article as "any item or technical data designated in the United States Munitions List, which includes aircraft and technical data and defense services directly related to military aircraft." *Id.* at 35. As for the USML, the Court instructed the jury as follows:

> The United States Munitions List is a list of defense articles, services and related technical data that are export controlled. It includes: (1) aircraft, including but not limited to helicopters, non-expansive balloons, drones, and lighter-than-air aircraft, which are *specifically designed, modified, or equipped for military purposes*. This includes but is not limited to the following military purposes: gunnery, bombing, rocket or missile launching, electronic and other surveillance, reconnaissance, refueling, aerial mapping, military liaison, cargo carrying or dropping, personnel dropping, airborne warning and control, and military training, and (2) technical data and defense services directly related to the defense articles including aircraft.

Charge to the Jury, at 39 (emphasis supplied) (incorporating Category VIII, subpart (a). The USML provides no definition of the term "military purposes," nor is there case law that provides guidance on how that term is to be construed.[3]

As acknowledged by more than one witness called by the government, even though the ultimate goal of the Air Force was to utilize technology developed or "optimized" during the Phase II contract, the scope of that contract was limited to applying plasma actuators to a civilian aircraft, not a military aircraft. *See* Phase II Proposal, G.E. 5 at pp. 26, 40. Mr. Crump contended, however, that the ultimate goal of the Air Force (to apply the technology to a military aircraft), rather than the scope of the proposal (which was incorporated by reference into the AGT/Air Force contract, *see* G.E. 2 at p. 4) controlled application of the USML to the items in question. Mr. Crump also invoked an unidentified "see-through" rule (apparently applicable to so-called "dual use" items regulated by the Commerce Department) as the basis of his conclusion that the data generated by the project related directly to a defense article.

The regulations invoked by the government and cited in the State Department certifications do not permit such a loose rationale. Category VIII, subpart (i) includes:

> Technical data (as defined in Sec. 120.10) and defense services (as defined in Sec. 120.9) *directly related to the defense articles* enumerated in paragraphs (a) through (h) of this category (see Sec. 125.4 for exemptions), except for hot

---

[3] The applicable regulations offer a self-referential definition of "aircraft" that is of no assistance herein. *See* 22 C.F.R. § 121.3 ("aircraft" includes "aircraft designed, modified, or equipped for a military purpose").

6

> section technical data associated with commercial aircraft engines. Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

22 C.F.R. § 121.1, Category VIII(i) (emphasis supplied). Setting aside the requirement that the aircraft must be specifically designed, modified or equipped for military purposes, and assuming one has demonstrated that the test data, for example, satisfy the definitional requirements of § 120.10 (*required* for the design of a defense article and *not* information concerning scientific principles taught in universities *nor* in the public domain), the plain meaning of the phrase "technical data . . . directly related to the defense articles" requires that it must be limited to data directly related *to the aircraft itself*. Technical data relating to aircraft engines, certain types of escape devices, launching and recovery equipment, certain types of navigational systems, etc., are covered by subparts (b)-(e), respectively. To construe subparts (a) and (i) as encompassing any existing or planned improvement to some component of an aircraft would obviate the need for any of the remaining subparts in Category VIII and is contrary to any reasonable interpretation of those provisions. Thus, for an item, or data relating to an item, to fall within subpart (a) of Category VIII, that item must be an *aircraft* specifically designed, modified, or equipped for military purposes, and the corresponding data must relate directly to that aircraft. The data which are the subject of the Indictment do not fit within this category, and therefore do not constitute technical data relating to a defense article within the meaning of Category VIII of the USML.

With respect to the Force Stand, Mr. Crump and the corresponding State Department certification identified subpart (h) as the provision as the basis for the contention that the Force Stand was a defense article. Category VIII, subpart (h) includes:

> Components, parts, accessories, attachments, and associated equipment (including ground support equipment) *specifically designed or modified for the articles in paragraphs (a) through (e)* of this category, excluding aircraft tires and propellers used with reciprocating engines.

22 C.F.R. § 121.1, Category VIII(h) (emphasis supplied). "Components," "parts," "accessories," and "attachments" are each defined terms. *See* 22 C.F.R. § 121.8 (b)-(d). These definitions compel the conclusion that the Force Stand was not a component, part, accessory, attachment or associated equipment of an aircraft, and therefore could not constitute a defense article within the meaning of Category VIII of the USML.

The foregoing are not the only reasons that the Phase II data and Force Stand cannot constitute defense articles as charged to the jury. Neither of them was to be applied to a *military* aircraft or, more precisely, an aircraft "specifically designed, modified, or equipped for military purposes." *See* 22 C.F.R. § 121.1, Category VIII(a). Mr. Crump's argument that the intended ultimate use of the actuators in such an aircraft controls is contrary to the plain meaning of the regulation.

Because this is a criminal prosecution, this Court should construe the above regulations strictly. As the Supreme Court and the Sixth Circuit have observed, Congress must speak clearly when enacting criminal statutes. *See, e.g.*, *United States v. Bass*, 404 U.S. 336, 349 (1971); *United States v. Turner*, 465 F.3d 667, 683 (6th Cir. 2006). In general, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971). "[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally v. United States*, 483 U.S. 350, 359-60 (1987); *see also D & W Food*

*Centers, Inc. v. Block*, 786 F.2d 751, 758 (6th Cir. 1986) ("No principle of law is better established than the necessity of the criminal law speaking clearly.").[4]

"This principle is founded on two policies that have long been part of our tradition." *United States v. Bass*, *supra*, 404 U.S. at 349. "First, 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.'" *Id*. (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.)). "Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies 'the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.'" *Id*. (quoting H. Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks 196, 209 (1967)). "Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant." *Id*.

For these reasons, this Court should hold that the Phase II data are not technical data covered by Category VIII of the USML and that the Force Stand is not a defense article pursuant to Category VIII of the USML.

---

[4] An interpretation of Category VIII of the USML to cover all the data generated during Phase II would give rise to a Constitutional violation for vagueness. A penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Fundamental fairness requires that persons of common intelligence not be compelled to guess at their peril whether or not their conduct may fall within the reach of a criminal statute. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972); *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926). Criminal statutes must draw reasonably clear lines between behavior which is forbidden and that which is not. *Smith v. Goguen*, 415 U.S. 566, 574 (1974). Where the legislature fails to provide such minimal guidelines, a criminal statute would impermissibly constitute "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 357 (citations omitted).

### b. There was no evidence that any publication restriction imposed on the Phase II project fit within the exceptions to fundamental research provided in the applicable regulations.

Although Dr. Roth acknowledged that Dr. Briggs had declined to allow publication of certain data without Air Force permission, there was no evidence that "the University or its researchers" had accepted any restrictions on publication of the Phase II data, 22 C.F.R. § 120.11(a)(8)(i), or that "specific access and dissemination controls protecting information resulting from the research are applicable," 22 C.F.R. § 120.11(a)(8)(ii). The only relevant evidence regarding whether research measuring the effectiveness of plasma actuators in controlling aerodynamic flow was fundamental research of the type commonly conducted in universities was the testimony of Dr. Roth and Xin Dai that they had already conducted prior research on this topic at the University of Tennessee Plasma Lab. Without proof of the required publication restriction, the Phase II data cannot fit within the definition of "technical data," and is therefore not within the reach of the AECA. *See* 22 C.F.R. § 120.10.

### 2. There was no evidence that the DARPA proposal was not the product of fundamental research with no restrictions on dissemination or publication.

The government bore the burden of proving that the information contained in the DARPA proposal was not in the public domain through fundamental research unrestricted by limitations on dissemination or publication. The government put on no proof regarding the existence of any publication restriction, or whether the research that gave rise to the Boeing data was fundamental research or already in the public domain. Instead, the government relied entirely on Mr. Crump's bald conclusion that the data fell within Category VIII subpart (i), and his testimony that there was no authorization for public release of that proposal (although it should have been granted if sought).

3. **At least in the context of a criminal prosecution, 22 U.S.C. § 2778(h) cannot preclude a judicial determination of whether the items which are the subject of the indictment constitute defense articles.**

   a. **Section 2778(h) does not exempt certifications from the State Department that particular data or an item is within Category VIII from review by a trial or appellate court.**

The language of section 2778(h) does not preclude judicial review of State Department interpretations that an item falls within a particular category on the USML. That section provides:

> The *designation* by the President (or by an official to whom the President's functions under subsection (a) have been duly delegated), *in regulations issued under this section*, of items as defense articles or defense services for purposes of this section shall not be subject to judicial review.

22 U.S.C. § 2778(h) (emphasis supplied). The "designation by the President . . . in regulations under this section [the ITAR]" of items as defense articles plainly refers only to the designation of categories within §121 (the USML), not subsequent interpretations by the State Department whether certain items fall within those categories. As referenced in the foregoing provision, the President's authority in this area is defined in section 2778(a)(1) of the AECA:

> . . . . The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

22 U.S.C. § 2778(a)(1). The President delegated this authority to the Secretary of State, who then promulgated the ITAR. *See* 22 C.F.R. § 120.1(a). Part 121.1 of the ITAR is the USML. Part 121.1(a) provides: "The following articles, services and related technical data are designated as defense articles and defense services pursuant to §§38 and 47(7) of the Arms Export Control Act (22 U.S.C. 2778 and 2794(7))." 22 C.F.R. § 121.1(a). The USML contains 21 categories of

items designated as defense articles including Category VIII—plasma actuators and technical data relating thereto is notably absent.

The "designation by the President" of items as defense articles within the meaning of section 2778(h) are the listings in Part 121.1 of the ITAR ("The following articles, services and related technical data are designated as defense articles and services."), the USML. *See also* 22 U.S.C. § 2778(a)(1) ("The items so designated shall constitute the United States Munitions List."). Section 2778(h) exempts from judicial review only the act of promulgating the contents of Part 121. By its terms, it does not address interpretation or certification by the Department of State as to whether a particular item is within a designated category on the USML. While Defendant would be precluded from challenging whether Category VIII (aircraft modified for a military purpose and technical data directly relating to such an aircraft) should be a defense article, Defendant is not precluded from challenging whether data relating to the optimization of plasma actuators or that contained within the DARPA proposal fall within Category VIII— particularly in the context of a criminal prosecution.[5]

There is no authority interpreting the scope of section 2778(h) from the United States Supreme Court or from the Sixth Circuit. At least two courts of appeal have appeared to exercise judicial review of a State Department determination. *See, e.g.*, *United States v. Tsai*, 954 F.2d 155, 160 (3d Cir.1992); *United States v. Johnson*, 139 F.3d 1359, 1364 (11th Cir. 1998). There are no cases that counsel is aware of in a criminal prosecution applying section 2778(h) to preclude judicial review of the government's interpretation of the USML as covering a purported defense article. *But see United States v. Martinez*, 904 F.2d 601, 602-03 (11th Cir. 1990), not

---

[5] This Court should view the government's introduction of expert testimony on this issue, and its lack of objection to extensive jury instructions that required the jury to find that the items in question were defense articles on the USML, as an implicit recognition that these are issues fit for determination by a jury, and subject to review by the trial court and an appellate court just as any other issue in a criminal case.

cited in *Johnson*, *supra*, 139 F.3d 1359; *Karn v. United States Dep't of State*, 925 F. Supp. 1, 8 (D.D.C. 1996). *Martinez* and *Karn* are both distinguishable, as discussed more fully below. *Martinez* pre-dates the 1989 amendment to the AECA adding section 2778(h), and *Karn* did not involve the heightened, Constitutional concerns present in a criminal prosecution.

In *Johnson*, *supra*, 139 F.3d 1359, the defendant was convicted of exporting zirconium compacts specifically designed for use in bombs without an export license. The *Johnson* court in fact conducted a review to determine whether the zirconium compacts were covered by Category IV(g) of the USML. *Id*. at 1364. The court concluded, in responding to defendant's argument that zirconium metal is a dual use item excluded from the USML, that the "district court properly held that such [zirconium] compacts were on the Munitions List," as a specifically designed component, part, accessory, attachment, and associated equipment of a bomb under Category IV(g). *Id*. The *Johnson* court affirmed the decision of the district court. *Id*. (citing *Tsai*, *supra*, 954 F.2d at 160 (holding evidence sufficient to prove that infra-red domes were specifically designed for missiles and therefore on the Munitions List)).

In *Tsai*, defendant challenged his conviction for violating the AECA by arguing that the evidence was insufficient as a matter of law to establish that the infra-red domes were items covered by Category IV(h) (components of missiles) on the USML. 954 F.2d at 159. The court held that the evidence was sufficient to support the verdict. *Id*. At trial, the government produced an expert who testified that infra-red domes were critical to operation of a missile and are military in nature. *Id*. at 158. The government also produced a Department of State certification that the infra-red domes required a license for export. *Id*. at 159. While the court rejected defendant's argument, it did so because, *upon review of the evidence*, the court held the

evidence was sufficient to conclude that Category IV(h) of the USML, the only one on which the jury was charged, covered the infra-red domes. *Id*. at 160.[6]

As stated above, the *Martinez* case arose before the AECA was amended in 1989 to add subsection (h) and is not cited in *Johnson*. *Id*. at 603 n.4. The *Martinez* defendant was convicted of exporting electronic systems designed to descramble pay television signals in conjunction with a home satellite receiver in violation of 22 U.S.C. § 2778. 904 F.2d at 601. Apparently conceding that they were aware that the devices were in fact on the USML, defendants challenged the inclusion of the descramblers on the list in the first instance—not any subsequent interpretation of the USML--on the grounds that they were not military in character and that the category of "cryptographic devices and software (encoding and decoding)" under Category XIII(b) of the USML list was overbroad. *Id.* at 601. The Third Circuit held that that the placement of the descramblers' on the USML—not some subsequent interpretation that the scramblers were within Category VIII(b)—was so inherently political so as to be excluded from judicial review. *Martinez* thus cannot be read as authority for the proposition that an interpretation of the USML, subsequent to the conduct in question, may not be judicially reviewed.

In *Karn*, a civil case, the exporter challenged under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, the Department of State's designation of "cryptographic software" as a defense article. The district court granted the State Department's motion to dismiss the APA challenge because it concluded that 22 U.S.C. § 2778(h) precluded judicial review of items deemed defense articles pursuant to the AECA. The *Karn* plaintiff had submitted a commodity jurisdiction request, *see* 22 C.F.R. § 120.4, to the State Department to determine whether a

---

[6] The court did not explicitly consider (and apparently the government did not argue) that the government's proof that the item was with a category on the USML was insulated from review by section 2778(h). *Id*.

diskette containing source code printed in his book on cryptography fell within Category XIII(b)(1) of the USML. 925 F. Supp. at 4. The Directorate of Defense Trade Controls ("DDTC") responded that the diskettes were governed by the ITAR. *Id*. The plaintiff's appeals were denied by both the determination to the Deputy Assistant Secretary of State and the Assistant Secretary of State for Political-Military Affairs. *Id*. The plaintiff then filed a complaint in the district for the District of Columbia to challenge the determination, contending that the diskette was in the public domain and was not subject to the ITAR.

The *Karn* court concluded that subsection (h) of the AECA, which bars judicial review of the President's designation of an item as a defense article, also precludes judicial review of the DDTC's determination that a specific item is covered by the USML. *Id*. at 6. The court rejected the plaintiff's reading—essentially the same as the one Defendant proposes herein—as "strained and unreasonable." *Id.* at 16.

The *Karn* court's rationale was premised on the fact that the parties had first exhausted the administrative "commodity jurisdiction" procedures set forth in the ITAR and authorized by the AECA as a predicate to the State Department's final determination that the items were in fact covered by the USML. *Id.*; *see also id.* at 18-19. The court noted that the plaintiff's challenge was "not of a nature that commanded a heightened presumption in favor of judicial review," *id.* at 20, and that permitting review of State Department determinations that an item was on the USML (as opposed to limiting that provision to the President's designation of the USML) would "open the floodgates to litigation." *Id.* at 22.

The *Karn* rationale does not apply to the instant case. For defendants in criminal prosecutions, there is a Constitutional requirement that a defendant be provided fair warning of conduct that is prohibited. For this reason, this court should not extend the *Karn* holding to a

criminal prosecution and should determine whether the items in question constituted defense articles, as the Eleventh Circuit did in *Johnson* and the Third Circuit did in *Tsai*.

Moreover, the government should not be allowed to unring the bell in this case. At trial, it put on proof from several experts that the items which are the subject of the Indictment were defense articles covered by the USML. The jury was instructed that the government must prove that Defendant exported a defense article listed on the USML, and defined the complex analysis that the jury was required to undertake to reach that conclusion. *See* Charge to the Jury at 34-40. The evidence offered to establish that the items constituted defense articles should be reviewed as any other evidence in the case.

> **b.  Construction of section 2778(h) so as to preclude trial or appellate court determination of whether an item is within Category VIII violates principles of due process.**

A construction of section 2778(h) that would preclude judicial review of the adequacy of the evidence that an item constitutes a defense article would violate the Constitutional due process requirement that criminal statutes provide "fair warning." *See United States v. Lanier*, 520 U.S. 259, 266-67 (1997); *United States v. Blaszak*, 349 F.3d 881, 886 (6th Cir. 2003). As the Supreme Court most recently articulated the fair warning requirement in *Lanier*, the "touchstone" is whether the statute in question, "either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." 520 U.S. at 267.

The *Lanier* Court identified "three related manifestations" of the fair warning requirement: (1) the vagueness doctrine; (2) the canon of strict construction of criminal statutes; and (3) the due process principle. 520 U.S. at 266. The canon of strict construction and its complement, the rule of lenity, requires that ambiguities in the statute be resolved in a defendant's favor. *Id*. In terms of due process, the *Lanier* Court stated that the fair warning

requirement bars courts from applying a novel construction of a criminal statute that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. *Id*. at 266.

If judicial review were extended not just to the President's designation of the items on the USML, but also to a determination—after the fact—that a defendant's conduct amounted to export of a defense article, the Department of State would have the unhindered ability to interpret the categories of the USML in a manner that deprived a putative defendant of fair warning—exactly what occurred in this case. The vagueness doctrine, the rule of lenity, and principles of due process require that section 2778(h) be construed to allow judicial review of a State Department certification.

Under *Lanier*, the issue is whether Category VIII "standing alone" made clear "at the relevant time" that the items in the Indictment were defense articles on the USML. For the purposes of the instant case, and as charged to the jury, Category VIII of the USML includes: (1) aircraft which are specifically designed, modified, or equipped for military purposes; and (2) technical data and defense services directly relating to that aircraft. At the time of Defendant's conduct, the regulation standing alone did not make it reasonably clear that any of the items subsequently certified by the State Department were defense articles within Category VIII of the USML—as evidenced by the differing opinions offered by knowledgeable government witnesses during trial. Thus, Category VIII of the USML failed to give Defendant fair warning that it covered the conduct alleged in the Indictment. An interpretation of the AECA to preclude judicial review of the State Department's determination that the items which are the subject of this Indictment were within Category VIII would violate Defendant's due process rights.

**4. The evidence is insufficient to establish that Defendant willfully exported technical data directly relating to a defense article.**

**a. The evidence is insufficient to establish that Defendant acted willfully.**

To willfully violate the AECA, Defendant must, at the least, act with knowledge that he is violating the law. As the discussion above illustrates, there is considerable uncertainty in the application of the law (and disagreement among the government's experts) in determining whether the Force Stand or Phase II data at issue was a component of or directly related to a military aircraft. Given this uncertainty in the law and the varying opinions of the government witnesses with expertise in the subject matter, there is insufficient evidence to conclude that the Defendant acted knowingly and willfully, and with the specific intent to violate a known legal duty. His efforts to comply with his inaccurate understanding of this complex regulatory scheme demonstrate a lack of understanding of the law that persisted throughout the time period in question. With respect to the DARPA proposal, there is no evidence that the Defendant ever opened that electronic document or was otherwise on notice that it contained export-controlled data.

**b. The evidence is insufficient to establish that Defendant entered into an agreement to willfully violate the AECA or intended to defraud the University of Tennessee.**

The conspiracy and wire fraud counts rise and fall with the AECA violations. For Defendant to be guilty of conspiracy, the government must prove beyond a reasonable doubt that he entered into an agreement either to willfully violate the AECA or to defraud the United States. *See United States v. Searan*, 259 F.3d 434, 441 (6th Cir. 2001). A conviction for conspiracy cannot be sustained unless the government establishes that the defendant had the specific intent to violate the substantive statute. *See id.*; *United States v. Cangioni*, 491 F.2d 906, 909 (2d. Cir. 1974). To sustain a conviction for wire fraud, the government must prove the Defendant

willfully violated the AECA or conspired to do so, since such violations were the prerequisite to a finding that he deprived the University of its right to his honest services.

## Conclusion

For these reasons, Defendant's motion for acquittal should be granted.

Respectfully submitted,

**NEAL & HARWELL, PLC**


By: s/Thomas H. Dundon
    Thomas H. Dundon, No. 004539
    Joshua J. Phillips, No. 025636
150 Fourth Avenue, North,
Suite 2000
Nashville, TN 37219
(615) 244-1713

*Counsel for Defendant J. Reece Roth*


## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2008, a copy of the foregoing Memorandum of Law in Support of Motion for Judgment of Acquittal was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

    s/Thomas H. Dundon